IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ADAM G. R.,**[1]

    **Plaintiff,**

v.

    Civil Action 2:22-cv-247
    Judge Edmund A. Sargus
    Magistrate Judge Chelsey M. Vascura

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Adam G. R. ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 7), the Commissioner's Memorandum in Opposition (ECF No. 10), and the administrative record (ECF No. 6). For the reasons that follow, the undersigned **RECOMMENDS** that the Commissioner's non-disability determination be **OVERRULED** and that this matter be **REMANDED** pursuant to Sentence 4 § 405(g).

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment or other disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

I.     BACKGROUND

Plaintiff protectively filed his DBI application in April 2018, alleging that he had been disabled since January 1, 2015.[2] (R. 298–99.) Plaintiff's applications were denied initially (R. 196–218, 219), and on reconsideration (R. 220–40, 241). A telephonic hearing was held on October 28, 2020, before an Administrative Law Judge ("ALJ") (R. 163–195) who subsequently issued a non-disability determination on November 16, 2020 (R. 141–62), which became final when the Appeals Council denied Plaintiff's request for review on November 22, 2021 (R. 1–7).

Plaintiff seeks judicial review of that final determination. He alleges that remand is warranted because the ALJ's residual functional capacity[3] determination was not supported by substantial evidence. (Pl.'s Statement of Errors 19–22, ECF No. 7.) Specifically, Plaintiff alleges that the ALJ erred when analyzing medical opinion evidence. (*Id*. at 20–21.) The undersigned agrees.

II.     RELEVANT MEDICAL RECORDS

The record reflects that Plaintiff had a remote history of concussion and head injuries while playing football. (R. 758.) In December 2013, Plaintiff was also injured when a tent he was erecting at work fell and hit his neck, shoulder, and head. (R. 759.) Afterwards he suffered headaches and shoulder pain necessitating shoulder surgery in 2014. (R. 759.) After he had shoulder surgery, Plaintiff's headaches worsened, and he began experiencing seizures in February of 2015. (R. 759.) On September 15, 2015, Plaintiff reported that he had experienced three seizures since his last appointment, although it is unclear when that appointment took place. (R.

---

[2] Plaintiff, via counsel, sought to amend his alleged date of onset to August 21, 2018. (R. 168.) The ALJ, however, appeared to consider Plaintiff's original January 1, 2015 onset date. (R. 144.)
[3] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

758.) Plaintiff also reported that he had another seizure on November 19, 2015, despite taking his prescribed medications. (R. 762.) Plaintiff's medications were adjusted (R. 762), and in April 2016, he reported that he had not experienced any seizures since Fall 2015 (R. 765). An epilepsy evaluation in August 2016 also recorded no seizures. (R. 827.)

On February 6, 2017, Plaintiff sought emergency treatment for a headache. (R. 401.) He reported that he had a history of seizures and that his last seizure had taken place one and half to two weeks prior. (*Id*.) Plaintiff again sought emergency treatment for back pain, dizziness, and seizures on August 18, 2018. (R. 496.) He reported that he had experienced a seizure the previous Sunday while in bed, and that he had possibly experienced a second one and woke up later and discovered that he had bitten his tongue and soiled himself. (R. 496.) On November 13, 2018, Plaintiff told a consultative examiner that he had experienced classic tonic-type seizures beginning in 2015, but more recently was experiencing breakthrough seizures where he blacked out and lost time. (R. 539.) He also reported that he had initially done "pretty well" on his medication Keppra, but over the course of the last six to eight months had begun to experience four to six seizures a month. (*Id*.)

On December 20, 2018, Plaintiff indicated that he had a seizure two weeks prior and that he was having them about two to three times a month. (R. 602.) On January 6, 2019, Plaintiff sought emergency treatment for a seizure. (R. 552.) Later that month, Plaintiff reported that although he was being treated with Keppra, and that it had been the most effective medication he had taken, he still continued to have tonic-clonic seizures. (R. 587.) He reported that he had seizures every three weeks. (R. 588.) Plaintiff was advised to undergo an EEG study with active seizure provocation. (R. 591.)

Such a study was done in March 2019. On March 4, 2019, Plaintiff reported that he had a seizure the prior day. (R. 627.) He was admitted to the hospital for five days, weaned from his medications, and deprived of sleep in order to induce a seizure under observation. (R. 592–94.) During this period, Plaintiff experienced of 2 electrographic seizures with right sided lateralization that were suspicious for frontal lobe involvement. (R. 593–94, 774.) He was advised to follow up with his neurologist and his PCP and to avoid dangerous activities such as swimming or bathing alone, working from heights, or driving. (R. 635.)

On April 25, 2019, Plaintiff reported that his last seizure had taken place during the study in March. (R. 643.) On May 28, 2019, Plaintiff reported that he was now controlling his seizures with treatment and that he wanted to address other health concerns, including neck pain. (R. 653.) But on June 11, 2019, Plaintiff reported that he had experienced three seizures that week. (R. 666.) He believed they may have been brought on by pain from physical therapy sessions for his treat neck pain. (*Id*.) On August 29, 2019, Plaintiff reported that he had experienced a seizure earlier that month. (R. 849.) Plaintiff was referred for neuropsychological testing to evaluate his candidacy for epilepsy surgery. (R. 853.) A neuropsychological evaluation on January 30, 2020, found that Plaintiff was not precluded from surgical candidacy. (R. 774.)

On January 16, 2019, Plaintiff sought emergency treatment for seizures. (R. 739.) He indicated that he had been seizure free from August through December but that he may have had a seizure on December 5, 2019, that was possibly provoked by an attempt to return to work. (*Id*.) In April 2020, Plaintiff indicated that he had about 10 seizures since December 24, and that he possibly had others about which he was unaware given that he sometimes woke up with blood in his mouth. (R. 746, 744.) He indicated that his seizure frequency was variable. (R. 746.) On October 9, 2020, a medical source wrote that although Plaintiff had not experienced tonic/clonic

seizures for approximately six months, he continued to suffer absence-type seizures on an almost weekly basis. (R. 825.)

Moreover, the record repeatedly reflects that Plaintiff reported barriers to treatment. For instance, on July 10, 2018, Plaintiff reported that he had not been able to follow up with a neurologist after being referred to one in February of that year because he had no insurance. (R. 831.) Likewise, on October 11, 2018, Plaintiff reported that he did not follow up as advised because he lacked insurance. (R. 518.) On November 13, 2018, Plaintiff reported that he had a neurologist, but that he could not afford to see him. (R. 539.) A provider noted on January 24, 2019, that Plaintiff's case had been "somewhat lost" due to his lack of medical insurance at times. (R. 587.) On October 9, 2020, Plaintiff indicated that he had reached out to his neurologist multiple times to schedule an appointment but had been unable to do so because of the pandemic. (R. 825.)

### III. THE ALJ'S DECISION

On November 16, 2020, the ALJ issued the unfavorable determination. (R. 141–62.) The ALJ initially noted that Plaintiff met the insured status requirements through December 31, 2022.

(R. 146.) At step one on the sequential evaluation process,[4] the ALJ found that although Plaintiff had been engaged in substantial gainful activity from April 2020 to June of 2020, there had been a 12-month period during which Plaintiff had not been so engaged. (*Id.*) At step two, the ALJ found that Plaintiff had the following severe impairments: mild cervical degenerative disc disease; history of left shoulder labral tear; status post-surgical repair; obesity; anxiety disorder; and depressive disorder. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 147.)

Before proceeding to step four, the ALJ assessed Plaintiff's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to frequent pushing and pulling with the left arm; frequent climbing ramps/stairs; no ladders/ropes/scaffolds;

---

[4] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> frequent reaching and occasional overhead reaching with left arm; must avoid workplace hazards such as unprotected heights and machinery; and no commercial driving. The claimant is limited to routine and repetitive tasks with no strict production quotas or fast-paced work such as on an assembly line.

(R. 149.)

At step four, the ALJ relied on testimony from a vocational expert ("VE") to find that Plaintiff was unable to perform his past relevant work as a generic office clerk, customer service rep, delivery driver, or retail clerk. (R. 155.) At step five, the ALJ again relied on the VE's testimony to find that in light of his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform, such as machine tender feeder inspector. (R. 156.) The ALJ, therefore, concluded that Plaintiff was not disabled from August 21, 2018, through the date of her determination. (R. 157.)

## IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "take into account whatever in the record fairly detracts from [the] weight" of the

7

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.  ANALYSIS

As also previously explained, Plaintiff asserts that the ALJ's RFC determination was not supported by substantial evidence. (Pl.'s Statement of Errors 19–21, ECF No. 7.) Specifically, Plaintiff alleges that the ALJ erred when analyzing medical opinions from medical sources including Plaintiff's neurologist, Dr. Berger. (*Id.*) The undersigned agrees.

An ALJ's RFC determination must be "based on all the relevant evidence" in a claimant's case record. §§ 404.1545(a)(1); 416.945(a)(1). The governing regulations[5] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)-(5).

With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including

---

[5] Because Plaintiff's application was filed in April 2018 (R. 298–99), his claims are governed by newer regulations applicable to applications filed after March 27, 2017.

controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, when evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ must consider the following factors: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and an ALJ must explain how he considered them. §§ 404.1520c(b)(2); 416.920c(b)(2). And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. *Id*. If, however, an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ must] articulate how [he or she] considered the other most persuasive factors . . . . . " §§ 404.1520c(b)(3); 416.920c(b)(3). In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each medical opinion individually. §§ 404.1520c(b)(1); 416.920c(b)(1). Instead, the ALJ must "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate." *Id*.

Plaintiff alleges that the ALJ erred when evaluating a medical opinion from Dr. Berger. (Pl.'s Statement of Errors 21, ECF No. 7.) At issue is a Seizures Residual Functional Capacity form completed by Dr. Berger on May 19, 2020. (R. 750–54.) In that document, Dr. Berger opined that Plaintiff had the following restrictions: Plaintiff's seizures were likely to disrupt co-workers; he could not work at heights; he could not work with power machines that require an

alert operator, operate a vehicle, or take a bus alone; Plaintiff would need to take two to three unscheduled 15-to-20 minute breaks per shift; he was limited to low-stress jobs; Plaintiff's condition was likely to produce good and bad days; and Plaintiff would likely be absent from work about twice a month. (*Id.*)

> The ALJ discussed Dr. Berger's opinions as follows:
>
> The opinions of Dr. Berger at 19F are persuasive to the extent he opines the claimant requires low stress work, and should avoid power machines. The undersigned has accommodated these limitations with the mental limitations and hazard restrictions as noted above. However, the remainder of his opinions are not well supported; including his opinion the claimant would require unscheduled breaks two to three times a day. Notably, Dr. Berger provided no response to the request for his reasons for this finding. Furthermore his opinion as to the claimant's absenteeism twice a month is not consistent with the record, documenting infrequent seizures, with the claimant reported months in between seizure activity. Furthermore, Dr. Berger stated the claimant as doing well on Onfi, Keppra, and Vimpat (Exhibit 19/F). Therefore, his opinions are only partially persuasive.

(R. 155.) The undersigned finds, however, that the ALJ's discussion mischaracterizes the form that Dr. Berger completed.

First, the ALJ found that Dr. Berger's opinion that Plaintiff would require unscheduled breaks two to three times a day lacked support. (*Id.*) Specifically, the ALJ noted that when Dr. Berger completed the form, he failed to provide a response to a question asking him to provide reasons for his conclusions. (*Id.*) But the record does not support that explanation. The form asked Dr. Berger to indicate if his patient would "sometimes need to take unscheduled breaks during an 8 hour working day." (R. 753.) The form then asked Dr. Berger to indicate "how often" he thought that was likely to happen and "how long (on average)" his patient would have to rest before returning to work. (*Id.*) True, Dr. Berger did not provide reasons when he responded by writing that Plaintiff would need to take unscheduled breaks "2-3 times per shift" and would need to rest for "15-20 minutes" after those breaks and before returning to work. (*Id.*) But, contrary to

10

the ALJ's explanation, the form did not ask Dr. Berger to provide such information in response to these questions. (*Id*.)

When evaluating Dr. Berger's opinion, the ALJ also wrote: "Dr. Berger stated the claimant as doing well on Onfi, Keppra, and Vimpat (Exhibit 19/F)," perhaps suggesting that Dr. Berger opined that Plaintiff's condition was well controlled with medications. (R. 155.) But the form asked Dr. Berger if his "patient suffered any side effects of seizure medication;" asked Dr. Berger to choose from a list of possible side effects; and asked Dr. Berger to indicate if his patient experienced any "other" side effects that were not listed. (R. 752.) In response to those prompts, Dr. Berger indicated that Plaintiff suffered from "other" side effects. (*Id*.) Dr. Berger elaborated by writing, "varied, currently doing well on Onfi, Vimpat, and Keppra." (R. 752.) Thus, it appears that Dr. Berger was writing that Plaintiff was doing well on his medications with regard to side effects. But the ALJ's explanation does not allow a reviewing Court to determine if the ALJ was remarking on the lack of side effects or if the relationship between Dr. Berger's statement and side effects escaped the ALJ's notice. Accordingly, the undersigned finds that the ALJ erred when evaluating Dr. Berger's opinion.

Because the undersigned reaches this conclusion, there is no need to consider Plaintiff's other contentions of error. Nevertheless, the ALJ may consider them, if appropriate, on remand.

## VI. RECOMMENDED DISPOSITION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability determination and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this R&R.

## VII.     PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                             /s/ *Chelsey M. Vascura*
                                             CHELSEY M. VASCURA
                                             UNITED STATES MAGISTRATE JUDGE